## UNITED STATES of America

### v.

**Mutulu SHAKUR, a/k/a "Doc," a/k/a "Jeral Wayne Williams," Sekou Odinga, a/k/a "Nathaniel Burns," a/k/a "Mgabasi," a/k/a "Mugubasi," a/k/a "Eddie Holmes," a/k/a "Lou," Cecil Ferguson, a/k/a "Mo," a/k/a "Chui," Edward Lawrence Joseph, a/k/a "Edward Lawrence," a/k/a "Jamal," a/k/a "Tony," a/k/a "J.R.," William Johnson, a/k/a "Bilal Sunni-Ali," a/k/a "Spirit," Silvia Baraldini, a/k/a "Louise," Susan Rosenberg, a/k/a "Elizabeth," Cheri Dalton, a/k/a "Nahanda," Iliana Robinson, a/k/a "Naomi," Nilse Cobeo, a/k/a "Nilse Lawrence," a/k/a "Ginger," a/k/a "Gigi," a/k/a "Giovanni Correa," and Alan Berkman, Defendants.**

No. SSS 82 Cr. 0312 (KTD).

United States District Court, S.D. New York.

March 28, 1983.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., New York City, for the Government; Robert S. Litt, Stacey J. Moritz, Asst. U.S. Attys., New York City, òf counsel.

Sekou Odinga, pro se.

Jesse Berman, New York City, for defendant Cecil Ferguson.

William Mogulescu, New York City, for defendant Edward Joseph.

Chokwe Lumumba, Detroit, Mich., Lynn Stewart, New York City, for defendant William Johnson.

Susan Tipograph, New York City, for defendant Silvia Baraldini.

Lawrence Stern, New York City, for defendant Iliana Robinson.

Robert Bloom, New York City, for defendant Alan Berkman.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

All defendants move to suppress the results of electronic interceptions made pursuant to the following seven electronic surveillance orders:

(a) The December 15, 1981 order issued by Judge Haight authorizing a wiretap on telephone numbers 926–9494 and 926–6673, located at 245 West 139th Street, Manhattan, the location of the Black Acupuncture Advisory Association of North America ("BAAANA"). This will be referred to herein as the "First BAAANA Tap".

(b) The January 14, 1982 order of Judge Haight authorizing a thirty-day extension of the tap on the two BAAANA phones described in (a), (the "Second BAAANA Tap").

(c) The February 13, 1982 order of Judge Weinfeld authorizing a second thirty-day extension of the tap on the two BAAANA phones described in (a), (the "Third BAAANA Tap").

(d) The March 1, 1982 order of Judge Haight authorizing a wiretap on telephone number 242–0702 in Apartment 2L, 85 Barrow Street, Manhattan, wiretaps on two public pay phones, telephone numbers 243–8722 and 243–8378, located near 85 Barrow Street, and a microphone "bug" placed inside Apartment 2L at 85 Barrow Street (the "First Barrow Street Tap and Bug").

(e) The March 15, 1982 order of Judge Haight authorizing a third thirty-day extension of the tap on the two BAAANA phones described in (a), (the "Fourth BAAANA Tap").

(f) The April 1, 1982 order of Judge Haight authorizing a thirty-day extension of the electronic surveillance at 85 Barrow Street (the "Second Barrow Street Tap and Bug").

(g) The April 16, 1982 order of Judge Haight, authorizing a fourth thirty-day extension of the tap on the two BAAANA phones described in (a), (the "Fifth BAAANA Tap").

## DISCUSSION

Title III provides for authorization of electronic surveillance if, on the basis of the facts submitted to the court,

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection

with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3). Defendants argue that all the wiretap orders violated this statute and the Constitution in several respects. To address defendants' contentions and the government's response, I will examine each wiretap order in turn.

### A. First BAAANA Tap

Defendants contend that this wiretap order is defective for both statutory and constitutional reasons.

#### (1) Statutory Defects

#### (a) *the order exceeded the Attorney General's authorization.*

█ Authorization for all electronic surveillance must be obtained from the "Attorney General, or any Assistant Attorney General specially designated by the Attorney General." 18 U.S.C. § 2516(1). Assistant Attorney General D. Lowell Jensen, Chief of the Criminal Division in the Department of Justice provided the requisite authorization for the first BAAANA Tap. In his authorization, however, Jensen stated that "[i]n supervising the interception . . . care should be exercised to avoid intercepting any communications of a person under criminal charges or indictment which pertains to his culpability in relation to the charges or indictment or the strategy that he contemplates employing in his defense." December 15, 1981 Authorization of Assistant Attorney General Jensen at 2. Defendants claim that Jensen thus imposed a limitation on the interception, a limitation that was not carried over into the government's wiretap application, nor into Judge Haight's electronic surveillance order. Thus, defendants assert, the wiretap order that issued was improperly broader than authorized. I find defendants' construction of Jensen's authorization strained. The words "care should be exercised" are cautionary and not restrictive.[1] Moreover, these cautionary

---

1. In response, the government submits a letter from Mr. Jensen, written subsequent to the authorization, in which he explains:

[T]he language from the authorization memoranda is not intended to be construed as the defendants contend. It was not intended to

words were carried over into AUSA Moritz's monitoring instructions to the agents. Therefore, I hold that the surveillance order is consistent with the requisite Attorney General authorization.

(b) *Jensen was not empowered to authorize the wiretap application.*

■ Defendants claim that Jensen's authority to provide wiretap authorization expired with the exit of the Carter administration and its Attorney General, Benjamin Civiletti. On February 27, 1981, however, William French Smith, Attorney General for the Reagan Administration, explicitly continued the authority of the Assistant Attorney General in charge of the Criminal Division by Order Number 934–81. Affidavit of AUSA Moritz, Exhibit D, section 2. The ability of Jensen, therefore, to authorize the instant surveillance orders remained intact.

(c) *The orders failed to particularize the conversations to be intercepted.*

Defendants assert that inadequate particularization of the conversations to be intercepted rendered the surveillance orders invalid. *See* 18 U.S.C. § 2518(4)(c); *Application of Lafayette Academy, Inc.,* 610 F.2d 1 (1st Cir.1979). The surveillance order provided for interception of communications relating to:

offenses of murder, in violation of 18 U.S.C. § 2113(e); bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d); and offenses involving murder and robbery; unlawful use of explosives, in violation of 18 U.S.C. § 844; interference with commerce by threats or violence, in violation of 18 U.S.C. § 1951; interstate or foreign travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952; theft from interstate shipment, in violation of 18 U.S.C. § 659;

interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2315; conspiracy to commit the above offenses, in violation of 18 U.S.C. § 371, as well as receiving income from a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962 and 1963, [and these interceptions were intended to obtain] *inter alia:* evidence of the above-stated offenses, including evidence of the identities of other participants in the offenses, the locations of participants in the offenses, some of whom are presently federal fugitives, the manner in which the offenses and illegal racketeering activities are conducted, specific plans for the escapes of presently incarcerated participants, other locations utilized in furtherance of those offenses and activities, and the distribution of the contraband and monies utilized in and obtained through said offenses and activities.

In determining whether such an order is sufficiently particularized, the Second Circuit has advocated a pragmatic approach requiring consideration of all of the papers submitted in support of the order. *United States v. Tortorello,* 480 F.2d 764, 780 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). These papers must contain identification of a specific crime or series of crimes, and a description of the general nature and type of the anticipated conversations. "[I]t is virtually impossible, [however,] for an applicant to predict exactly what will be said concerning a specific crime. The order must be broad enough to allow interception of any statements concerning a specified pattern of crime."

■ Both the instant order and the accompanying "minimization" instructions although "couched in general terms," sufficiently detail and limit the purpose and duration of the types of conversations to be intercepted to pass muster under the

---

be a limitation on the electronic surveillance authority granted in this matter; rather, the language is in the nature of a supervisory admonition to law enforcement personnel charged with implementing the intercept orders. The language is intended to refer only to minimization of privileged communica-

tions, i.e. to communications between an attorney and his client concerning an already pending criminal case.
Affidavit of Assistant United States Attorney ("AUSA") Moritz, Exhibit C at 2 (hereinafter "AUSA Moritz Affidavit").

Fourth Amendment.[2] "When, as here, a continuing course of criminal conduct is involved, a wiretap order must necessarily be framed flexibly enough to permit interception of 'any statements concerning a specified pattern of crime.' " *United States v. Steinberg*, 525 F.2d 1126, 1131 (2d Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976) (citations omitted). The present situation also allegedly involves a "continuing course of criminal conduct." Furthermore, the Second Circuit previously has found similarly-worded warrants constitutionally valid. *See, e.g., Tortorello*, 480 F.2d at 778–89 (order permitting interception of conversations constituting evidence of "the crimes of Burglary, Forgery as a felony, Possession of Forged Instruments as a felony, Possession of Forgery Devices, Grand Larceny in the First Degree, Criminal Possession of Stolen Property in the First Degree, and conspiracy to commit said crimes"); *Steinberg*, 525 F.2d at 1131–32 (order permitting the interception of communications "which reveal the details of the scheme ... to distribute, deliver and possess with intent to distribute and otherwise illegally deal in narcotics ... and the identity of [named interceptee's] confederates, their places of operation and the nature of the conspiracy"); *United States v. Principie*, 531 F.2d 1132, 1139 (2d Cir.1976), *cert. denied*, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977) (upholding order which authorized interception of conversations relating to the "procurement and disposition of stolen securities" constituting "Grand Larceny in the Second Degree, Criminal Possession of Stolen Property in the First Degree, and Conspiracy to commit said crimes"). For these reasons, therefore, I find the order was sufficiently particularized.[3]

**(d)** *The government failed to show that alternative investigative methods were inadequate.*

■ An electronic surveillance order may be issued only after a finding that "normal investigative techniques have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Defendants assert that the affidavits in support of the wiretap application did not set forth sufficiently the inadequacy of alternative investigative techniques. I disagree.

Maxwell's affidavit in support of the wiretap application describes the failure of physical surveillance, informants, and undercover agents to obtain the information sought by wiretap. Physical surveillance was hampered by the acupuncture clinic's mid-block location, and the subjects' alleged use of countersurveillance techniques.[4] Moreover, physical surveillance of meetings outside the clinic, or of suspects entering the clinic would not reveal the information sought: unknown participants, locations of fugitives, and plans for future crimes.

■ Informants who had been inside the alleged network in the past also were inadequate because they were either in jail or no longer had access to ongoing criminal planning. *See* Maxwell Affidavit In Support of Application For Electronic Surveillance at 30–31 (hereinafter "Maxwell Affidavit"). The suspects alleged propensity for violence also prevented the informants from safely

---

**2.** The minimization instructions, that were attached to the First BAAANA order, provided that agents were to intercept conversations by any of the wiretap subjects involving the enumerated offenses that concerned:

the means by and manner in which these persons conduct and participate in certain illegal activities ... as well as the identities, roles and locations of other participants in those illegal activities, specific plans for escapes of presently incarcerated participants, other locations utilized in furtherance of the illegal activities set forth below, and the distribution of the contraband and monies utilized in and obtained through said activities. AUSA Moritz Affidavit, Exhibit A at 4.

**3.** Judge Haight also ordered five day interim reports by which he monitored his order's implementation. This further imparted specificity. *See Steinberg*, 525 F.2d at 1132.

**4.** For example, it is alleged that subjects leaving the building would crisscross the street or start in one direction and suddenly reverse their direction in apparent efforts to evade law enforcement.

arranging the introduction of an undercover agent. *Id.* When, as here, the government has demonstrated in its affidavits that an attempt to secure the evidence by an undercover agent would create a substantial risk of serious harm, it is not necessary that an actual attempt be made.[5]

A search warrant also did not appear to have the potential for revealing plans of future crimes, or identities and locations of participants and fugitives. Previous searches of various safe houses demonstrated the veracity of this statement. Moreover, the BAAANA occupants' obvious countersurveillance efforts made it unlikely that they would leave such evidence in a building the occupants apparently suspected was being watched.

Telephone toll records and pen register devices could show only that a conversation had occurred. They could not reveal the subjects discussed or the actual participants. *See United States v. Terry,* 702 F.2d 299 at 310 (2d Cir.1983); *United States v. Todisco,* 667 F.2d 255, 258–59 (2d Cir.1981), *cert. denied,* 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982). Therefore, I find that the government sufficiently established the inadequacy of alternative modes of investigation to support this finding by Judge Haight.

(e) *Improper minimization of intercepted privileged conversations.*

A number of named subjects of the surveillance order were involved in legal proceedings at the time of the First BAAANA Tap authorization. The "minimization" instructions to the monitoring agents, therefore, described procedures for minimizing the interception of non-relevant and privi-

leged legal conversations. Nonetheless, defendants maintain that for most of the first thirty-day period the monitoring agents listened to privileged conversations.

 Communications between attorney and client are not *per se* privileged. *See, e.g., United States v. Loften,* 507 F.Supp. 108 (S.D.N.Y.1981) ("A communication designed to enable or assist a client or an attorney in the commission of a crime or with respect to a continuing crime or fraud is not privileged.") (citations omitted). It was improper, on the other hand, for the agents to listen to privileged attorney/client conversations. Defendants apparently seek suppression of all conversations because of this alleged improper minimization. The Second Circuit has declined to address the issue of whether all conversations or only improperly seized conversations should be suppressed when minimization is insufficiently conducted. *See Principie,* 531 F.2d at 1139–41. The court in *Principie* suggested, however, that the officer's good faith execution of minimization instructions only would necessitate exclusion of particular conversations when the misconduct was not severe. *Id.* 1140–41. In either case, defendants have not demonstrated or explicitly asserted that there was an ongoing, frequent and bad faith attempt to obtain such privileged conversations that could amount, arguably, to a due process violation.[6] Therefore, though defendants may move to suppress those particular conversations that were privileged should the government attempt to introduce them at trial, the electronic surveillance order as a whole is not statutorily or constitutionally invalid.[7]

---

5. [A]n affidavit is not insufficient because it did not prove beyond a shadow of a doubt that ordinary techniques will fail or that their use will result in a loss of life or some equivalent disaster. The standard of reasonableness should be employed in measuring the affidavit against the statutory requirements. *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir.1977).

6. To the extent that defendants are asserting such a due process violation, *see* Sunni-Ali Motion to Dismiss, it is addressed below in dis-

cussing prosecutorial misconduct. *See infra* section (A)(2)(a)(iii).

7. Defendants also note several times throughout their moving papers that the governments' various wiretap applications contained the factually impossible assertion that Ferguson was implicated in an armed robbery in Inwood, New York in April 1980. Ferguson was incarcerated in Pittsburgh, Pennsylvania continuously from December 1977 to December 1980. This alleged misstatement, however, was incidental in the probable cause determination.

**(2) Constitutional Grounds**

Defendants attack both Judge Haight's probable cause determination and the constitutional validity of the affidavits underlying that determination. The latter ground for suppression, more specifically, concerns the government's use of informants in support of the electronic surveillance application. I address that question first.

**(a) *The Informants.***

The government's initial wiretap application mentions two informants. Only one is relevant for purposes of the December 15th application: Samuel Brown.[8] Brown is a defendant in a parallel state court criminal proceeding also arising out of the October 20, 1981 events in Nyack and Nanuet, New York (the "Rockland proceeding"). The government asserts that Brown agreed to provide the federal authorities with information concerning details of the preparation and execution of the October 20, 1981 armed bank robbery. This information is recounted by Agent Maxwell in his affidavit in support of the electronic surveillance application. In fact, Brown's information comprises a substantial part of Maxwell's affidavit, which itself is the principal affidavit in support of the wiretap.

■ Beginning with *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Supreme Court has circumscribed the use of information received from informants that is then used to support a finding of probable cause. These cases require that I examine whether the informant's information or the "tip," apart from any independent corroboration included in the affidavit, passes a two-pronged test: (1) whether the facts provided sufficiently established the reliability of the informant, and (2) whether the tip "contained a sufficient

statement of the underlying circumstances" on which the informer based his or her conclusions. *Spinelli,* 393 U.S. at 416, 89 S.Ct. at 589. The first prong tests the reliability of the informant; the second is necessary to determine the reliability of the information. If the tip is found inadequate under the *Aguilar-Spinelli* test, the extent to which the tip was corroborated independently then should be considered. *Id.* at 415, 89 S.Ct. at 588. The question at this juncture is: "Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass the *Aguilar* tests without independent corroboration?" *Id.*

■ The defendants do not strenuously attack the facial sufficiency of the wiretap affidavits under the *Aguilar* standards. This is understandable. Brown's admitted participation in the October 20th incidents meets the second prong's requirements. *See United States v. Harris,* 403 U.S. 573, 579, 91 S.Ct. 2075, 2080, 29 L.Ed.2d 723 (1971); *Jones v. United States,* 362 U.S. 257, 267–68, 80 S.Ct. 725, 734–35, 4 L.Ed.2d 697 (1960). Brown's participation also satisfies the first *Aguilar-Spinelli* prong under the Second Circuit rule enunciated in *United States v. Rueda,* 549 F.2d 865, 869 (2d Cir.1977) ("there is no need to show past reliability where the informant is in fact a participant in the very crime at issue.").

Although Brown's information satisfies the *Aguilar-Spinelli* test, it also is significant that Brown's statements were corroborated extensively by independent information set out in Maxwell's wiretap affidavit. I will not reproduce the full description of this corroboration herein. *See generally* Maxwell Affidavit at 20–22. His recitation closely conformed to the information known to the FBI and included the following significant and corroborated data that was not publicly known at the time of Brown's statements. Brown stated that defendant

---

8. In its December 15th wiretap application affidavits, the government labelled its confidential informants CS1 and CS2. CS2 is only mentioned briefly once, while CS1 is mentioned throughout Agent Maxwell's affidavit. Subsequently, it was disclosed that CS1 was Samuel Brown. I will refer to him as Samuel Brown in discussing the statements made concerning CS1, though his actual identity was not known to Judge Haight.

Ferguson fired an M–16 automatic rifle during the robbery and escape. M–16 spent cartridges were found at both the robbery and roadblock site. Similarly, Brown stated that defendant Shakur fired a nine millimeter handgun during the shootout at the roadblock. Spent nine millimeter shells were also found at the roadblock, and a nine millimeter gun was recovered from a search of a safehouse allegedly rented by another participant in the Brinks' robbery. Brown stated that Marilyn Buck participated in the robbery and escaped from the roadblock in a white Oldsmobile. Blood found in a subsequently recovered white Oldsmobile registered to Buck was found to be the same as blood found in a safehouse rented by Buck. In short, the facial validity of the informant's tip is well established.[9]

The crux of defendants' suppression motion, however, goes behind the wiretap papers. Defendants assert that even though Maxwell's affidavit may have established probable cause, it contained "material misstatements and material omissions" of fact relevant to Brown's reliability. More specifically, defendants allege that several facts were withheld from Judge Haight concerning Brown's proclivity for lying, and the precarious state of his mental health.

■ *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), lays out the standard by which the truthfulness of an affidavit is tested. This standard applies to the threshold determination of whether a hearing is required, and, apparently, to the determination of when the affidavits are constitutionally defective. *See United States v. Barnes,* 604 F.2d 121, 152–53 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). The standard enunciated and discussed by the Supreme Court is the following:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and

must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

*Franks v. Delaware,* 438 U.S. at 171–72, 98 S.Ct. at 2684–85 (footnote omitted).

In support of its motion to suppress the electronic surveillance the defendants provided several affidavits sworn to by Brown. In them, Brown alternatively alleged that he had been beaten by state and federal authorities or by state authorities with the knowledge of the federal government, and that he had been threatened, cajoled, and coerced into providing the statements the FBI used in support of the wiretap applications. In addition, the defendants provided evidence that at least as of January 13, 1982, a state instigated psychiatric examination had found Brown "totally unstable and hallucinating." Affidavit of Jesse Berman, Exhibit D at 81. Together, I found that these allegations warranted an evidentiary hearing.

*United States v. Harris,* 403 U.S. at 593, 91 S.Ct. at 2086 (Harlan, J., dissenting).

---

**9.** The exceptional detail of the information also supports the reliability determination. · *See*

Accordingly, I held a hearing from February 24, 1983, to March 8, 1983. The testimony at the hearing centered around the issue whether the government had by "deliberate falsehood or with reckless disregard for the truth" withheld *material* facts from Judge Haight concerning Brown's reliability. In addition, defendants argued at the hearing that Brown's statements were coerced, and that in any case the electronic surveillance was obtained by prosecutorial misconduct that violated the due process clause. I will address these latter two issues after examining whether material misrepresentations were made in the wiretap affidavits.

(i) Material Misrepresentations

The facts allegedly omitted from the wiretap application can be grouped into two categories: (1) Brown's physical and mental health deficiencies, and (2) Brown's propensity for prevarication.

(A) Brown's mental and physical health

Brown provided the information recounted in the wiretap applications during ten meetings with FBI agents Maxwell and Cordier.[10] During the first four meetings both Cordier and Maxwell testified that Brown was coherent, responsive, had good recollection, and appeared rational.

After introductions on November 21, Brown immediately launched into a long monologue concerning the October 20 events and the history leading up to the attempted armed robbery.[11] Tr. at 594. Several times Brown wandered off from the subjects of interest to the agents. At that point, the agents would ask questions to refocus Brown's attention. Brown never, however, wandered into completely un-

related topics, Tr. at 447–48 & 603, though his speech did become disjointed and suddenly agitated on occasion. Tr. at 612.

Brown's physical condition also was impaired. He wore a neck brace at all of their meetings that he said was the result of two automobile accidents. He also stated that he had been beaten severely by Rockland County officials. Brown walked slowly and stiffly according to agent Cordier, as if he had been injured. Brown allegedly said that he experienced pain intermittently, but only at night. Neither agent, however, felt his physical condition affected his ability to speak with the agents. None of this information about his physical or mental condition appears in the December 15 Maxwell Affidavit.

In addition, the defendants attempted to paint a darker picture of Brown's mental and physical condition. Their principal witness was David Gilbert, who presently is under indictment in the Rockland proceeding. Gilbert related that Brown was beaten frequently between October 20 and October 27. The result, Gilbert described, was a man substantially impaired in his mental faculties and his selfworth. Brown assertedly would rave, hallucinate, hear voices, and experience wild mood changes. Brown's dealings with authority, Gilbert maintained, were marked by an unbalanced obsequiousness.

Defendants also introduced many of Brown's medical records for the relevant periods. Neither Cordier nor Maxwell ever examined these records.[12] Although it is the affiant's knowledge that is important, *see Barnes,* 604 F.2d at 152–53, these records still are relevant. The medical records may describe mental problems whose exter-

---

**10.** Maxwell and Cordier met with Brown on November 21, 1981; November 25, 1981; December 3, 1981; December 13, 1981; December 31, 1981; January 6, 1982; January 8, 1982; January 29, 1982; March 27, 1982, and March 30, 1982. Brown's statement that Maxwell recounted in the wiretap applications was given to the agents at the December 3, 1982 meeting. For the purposes of evaluating the December 15th wiretap application, the first four meetings are relevant. In addition, FBI agent

O'Connor met with Brown on November 12, 1982. O'Connor's meeting was never part of the wiretap application process.

**11.** "Tr." refers to the transcript of the suppression hearing.

**12.** Although the agents might have been able to gain access to the medical records, it is undeniable that they were privileged documents.

nal manifestations might or should have been apparent to agents Cordier and Maxwell.[13]

A review of the medical records do not provide the compelling evidence the defendants would like. The most relevant entries are found in the Otisville medical record prepared primarily by Chief Medical Officer Albert Rossi, M.D. Eighteen days before the first FBI meeting with Brown, Dr. Rossi wrote a memorandum to Warden Quinlan of Otisville, which is reproduced in full below:

Psychiatric evaluation of this inmate received at FSI [sic] Otisville on October 26, 1981, followed a psychological interview by Dr. Ron Konowitz, Chief, Psychology Service, on the day of admission. At that initial interview, he appeared calm initially but as it progressed, he became agitated. While his speech was clear throughout, the content of speech became disjointed and marked by loosening of associations. His concentration at times was impaired and his response to questions seemed irrelevant and inappropriate. During the psychologocial [sic] interview, he became increasingly agitated and asked to lie down. The interview was terminated at that point. Dr. Konowitz's impression was that of an acute psychotic episode.

13. The agents' "knowledge" also could include those items such as medical records that they ignored in reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. at 171–72, 98 S.Ct. 2684–85.

14. This assessment that Brown had a schizotypal personality disorder (301.22) was carried over into a medical record prepared by Dr. Rossi and dated November 23, 1981. Defendants' Exhibit B. The reference in both entries is to the standardized American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (hereinafter "DSM–III"). DSM–III describes this personality disorder in part as follows:

301.22 Schizotypal Personality Disorder
The essential feature is a Personality Disorder (p. 305) in which there are various oddities of thought, perception, speech, and behavior that are not severe enough to meet the criteria for Schizophrenia. No single feature is invariably present. The disturbance in the content of thought may include magical thinking (or in children, bizarre fantasies or preoccupations), ideas of reference, or para-

On November 3, 1981, I had an hour interview with Mr. Brown during which he demonstrated various oddities of thinking, perception, communication and behavior, but never severe enough to meet the criteria for Schizophrenia. The disturbance in thinking was expressed as ideas of reference and paranoid ideation. Perceptual disturbances exhibited included recurrent illusions and depersonalization. In communication, he showed marked peculiarities—expressing concepts unclearly and oddly, using words deviantly. He remained socially isolated with constricted and inappropriate affect—to a degree that it interfered with rapport during the one hour of face-to-face interaction. Due to his peculiarities in thinking, he had eccentric convictions—bigotry and fringe religious beliefs. During his stay at this facility, he has shown brief periods of bizarre behavior and oddities of thinking which approach delusional proportions. The short-lived psychotic episode witnessed by Dr. Konowitz is a complication of this inmate's psychiatric classification—*Schizotypal Personality Disorder* (301.22).

Defendants Exhibit E.[14] On December 6, 1981, the entry states that at 10 p.m.:

noid ideation. Perceptual disturbances may include recurrent illusions, depersonalization, or derealization (not associated with panic attacks). Often, speech shows marked peculiarities: concepts may be expressed unclearly or oddly or words used deviantly, but never to the point of loosening of associations or incoherence. Frequently, but not invariably, the behavioral manifestations include social isolation and constricted or inappropriate affect that interferes with rapport in face-to-face interaction.

Impairment. Usually some interference with social or occupational functioning occurs. *Id.* at 312. Depersonalization is described as: [A]n alteration in the perception or experience of the self so that the usual sense of one's own reality is temporarily lost or changed. This is manifested by a sensation of self estrangement or unreality .... Derealization is frequently present. This is manifested by a strange alteration in the perception of one's surroundings so that a sense of the reality of the external world is lost. *Id.* at 259.

inmate [Brown] yelling, banging fists on wall and cell door—saying he is going to tear up cell. Agitation and anxiety noted. Patient crying uncontrollably and yelling. Acute agitation. Call to Dr. Rossi—recommend (1) Thorazine 50 mg IM stat (2) will evaluate in A.M. further.

Defendants' Exhibit E. The defendants also cite Brown's conduct on January 8, 1982. This conduct, because it transpired after December 15, is inferentially weak at best. Nonetheless, it is recounted as some support for defendants' theory. On that occasion, Dr. Rossi was summoned at 2:30 a.m. to Otisville because:

> Mr. Brown experienced a brief psychotic episode—'heard voices defaming his God.' Became agitated, broke glass of ceiling light and lacerated multiple areas of both forearms and cheeks. Unable to move R. 5th finger, fixed in flexion. Wounds superficial, not requiring sutures, cleansed thoroughly. Denies swallowing glass, examination of oral cavity negative. Rx Thorazine 50 mg 1 or stat, dress wounds, x-ray of R. hand, admitted to hospital cell.

Defendants' Exhibit E.

There is no doubt that Brown was at times a disturbed man. It would appear, however, that all the episodes of Brown's unusual behavior were brought to the attention of the medical authorities and dutifully recorded. Therefore, putting aside the acknowledged fact that Brown often spoke in an agitated and disjointed fashion,[15] the FBI agents could have discovered only two incidents of Brown's "impaired" behavior in the medical records. Moreover, the first was a month before Brown provided the information in the Maxwell Affidavit, approximately ten days after the infliction of substantial trauma and was of limited duration. The second incident, like the first, also apparently was "short-lived." The following day, Dr. Rossi stated that Brown though "somewhat sedated from

[the] Thorazine however remains alert, responds intelligently, there are no signs of superficial trauma, and his only complaint remains tightness" of his neck muscles. *Id.* (Dec. 7, 1981 entry). The agents actually were aware of the December 6, incident, but not through the medical records. Brown told the agents of this, and explained that it had been a reaction in part to being "accused" of homosexuality. The agents testimony that they noticed on a day-to-day basis only his oddities of speech, therefore, is consistent with the medical evidence.

■■ The evidence thus confirms the FBI agents' observation that Brown's only manifested signs of illness were disjointed and agitated speech. These signs were not material facts omitted from the wiretap application. The omission of these facts also does not make the agents' failure to investigate Brown's mental history "reckless." The only evidence produced at the hearing that these speech defects were not the only signs of illness was provided by David Gilbert. I did not find Gilbert completely credible, however. I do not believe that Gilbert's expressed concern for Brown was real. Gilbert's steadfast and sincere belief in his "anti-imperialist cause," however, does seem clear. I also find that these strong beliefs could and did lead him to exaggerate the extent of Brown's aberrant behavior. Gilbert, furthermore, who had much to gain and nothing to lose by his testimony, did not observe Brown's behavior when he met with the FBI agents. Were his statements true, I would expect more corroborating evidence of Brown's behavior during the period prior to December 15. The agents, moreover, were obtaining information from an admitted participant in the armed robbery attempt. Many of his statements were corroborated. *See supra* section (A)(2)(a). With such confirming evidence in support of Brown's statements,

---

**15.** Brown's speech oddities are revealed in the transcript of proceedings in which Brown spoke before New York State Supreme Court Justice Stolarik in Rockland County on January 6, 1983. The proceedings concerned the release of Evelyn Williams as Brown's attorney. *See* Defendants' Exhibit at 14, 24–25, & 59. This transcript also reveals, however, that Brown was understandable and able to communicate his views.

they had little reason or justification to believe that his occasionally aberrant behavior rendered him unreliable or that this behavior would have been material to Judge Haight on December 15. In short, I find that the evidence of Brown's mental deficiencies omitted from the December 15 was not material. In addition, the agents' failure to obtain more information was not a reckless or deliberate disregard for the truth.[16]

### B. Lack of truthfulness

██ Defendants also claim that the agents failed to disclose to Judge Haight that Brown was a "pathological liar." The agents admitted that several "facts" Brown told them later proved to be false. The agents went on to state, however, that until December 13th or December 31st these false statements, as far as they knew, only concerned Brown's role in the armed robbery attempt. This fact did not surprise the agents because it was not unusual for a cooperating witness to minimize his culpability. Thus, this omission was immaterial and does not evidence a reckless or deliberate disregard for the truth.

### (ii) Coercion

Defendants, at the suppression hearing, apparently abandoned their allegations that the FBI beat Brown.[17] Instead, they argued first that the FBI knew that the state authorities had beaten Brown, and took advantage of Brown's subsequent fear of both further beatings and of all law enforcement officials. Second, they argue that the FBI forced Brown to cooperate by either improperly promising or threatening to withhold from Brown the medical attention that he desperately desired.[18]

**16.** The Second Circuit has stated that suppression also may be warranted when "an affiant *intentionally* misstates facts which are *immaterial* to a finding of probable cause .... Arguably, in an extreme case, allegations of deliberate misrepresentations on the part of the Government's agents may suggest the need for a hearing to determine whether the perjury infects the proper administration of justice." *United States v. Barnes,* 604 F.2d at 153 n. 17 (emphasis in original). The present case, however, is not such a situation. As I note, at best the agents omitted immaterial facts; the suppression hearing did not reveal any intentional misconduct. Moreover, the extent of prosecutorial misconduct is a matter I turn to below. *See infra* section (A)(2)(a)(iii).

**17.** Moreover, Brown's earlier affidavits never mentioned FBI mistreatment. The later allegation that he was beaten by federal law enforcement was not made until April 1982, despite the fact that Brown's attorneys allegedly knew as early as November 1981 of such beatings.

**18.** Brown took the witness stand at the suppression hearing. He did not answer any questions, however, invoking his Fifth Amendment privilege against compelled self-incrimination. Defendants asserted that Brown should be required to answer some questions. I upheld Brown's right not to answer any *relevant* questions because his assertion of the privilege could have been based, *inter alia,* on avoiding perjurious statements. Brown had made numerous sworn affidavits since October 1981 that concerned the subjects defendants wished to question Brown about. Defendants maintained that fear of perjury is not a valid basis

for asserting the Fifth Amendment, citing *United States v. Zappola,* 677 F.2d 264 (2d Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982); *United States v. Seewald,* 450 F.2d 1159 (2d Cir.1971), *cert. denied,* 405 U.S. 978, 92 S.Ct. 1206, 31 L.Ed.2d 253 (1972); *United States v. Bums,* No. 81–456, Tr. at 1071–73 (S.D.N.Y. October 27, 1981). In *Seewald,* however, the witness refused to testify even though he was "protected against criminal prosecution for any matters regarding which he might testify ...." *Seewald,* 450 F.2d at 1162. Likewise, in *Zappola* the informant refused to answer questions concerning his conduct as a government agent, conduct for which he was protected from criminal prosecution. *Zappola,* 646 F.2d at 53. Finally, in *Bums,* the witness feared perjuring himself in his present statements, not prior statements. In the instant case there are prior sworn statements. Moreover, arrayed against the defendants' position are numerous cases that hold that potential perjury from prior sworn statements is a valid basis for asserting the Fifth Amendment. *See, e.g., In re Corrugated Container Antitrust Litigation,* 644 F.2d 70, 75 n. 7 (2d Cir.1981); *United States v. Partin,* 552 F.2d 621, 632 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). In addition, Brown obviously did not waive his privilege *in this proceeding. See United States v. James,* 609 F.2d 36, 45 (2d Cir.1979), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).

Brown asserted his privilege to certain questions that were totally irrelevant. I saw absolutely no point in going through the formalistic

Although I reject both of defendants' contentions, I do not mean to depreciate their allegation of beating by state authorities. Equally, I note that the record is incomplete because the accused officers were not required to respond.[19] The possibility that such misconduct may have occurred, moreover, cannot cloud my duty to examine neutrally the constitutional implications, notwithstanding that such beatings may have occurred. Based principally on the agents' testimony, I find that even if they did occur, whatever effects they may have had on Brown were too attenuated by December 3rd to have resulted in the impact argued by defendants.[20] In addition, Brown signed waiver of rights' forms at each of his meetings with the FBI agents. Defendants were unable to impeach the validity of these waivers.

The argument that the agents threatened to withhold medical treatment remains speculative at best. The defendants fervently pressed this argument during the hearing, but the evidence did not support their claim. Brown did need additional medical treatment during this period and he received the required medical treatment in January 1983.[21] The agents credibly denied, however, making any threats or promises. In the absence of any proof to the contrary, the defendants' argument is purely speculative. In sum, therefore, the evidence at the suppression hearing did not reveal that the FBI coerced Brown either through physical abuse or the dangling of medical treatment into providing the De-

cember 3rd statements that form the basis for Maxwell's December 15 affidavit.

### (iii) Prosecutorial Misconduct

Many of the defendants' arguments such as improper minimization, reckless misstatements of fact, and inappropriate interference with Brown's exercise of his Fifth Amendment rights in essence are allegations of prosecutorial misconduct. The extent to which such misconduct "taints" the government's case requires an analysis of all evidence introduced against the defendants. Therefore, this issue can be resolved properly only after the trial. *See United States v. Ostrer,* 481 F.Supp. 407, 414–15 (S.D.N.Y.1979).

Accordingly, for all the reasons mentioned above, I find that the use of Brown's statements in Maxwell's December 15 affidavit in support of the wiretap application was valid constitutionally. In addition, any inquiry into alleged prosecutorial misconduct will occur after the trial. Having concluded that Brown's statements were constitutionally included in Judge Haight's probable cause determination, I now turn to the correctness of that determination.

### (b) *Probable Cause.*

Defendants maintain that even accepting the constitutionality of Brown's statements, there was no probable cause to believe that "particular communications concerning [the charged] offense [would] be obtained through [electronic] interception." 18 U.S.C. § 2518(3)(b).[22]

---

drill of sustaining objections to these questions. Defendants argue that they should have been permitted to examine Brown to determine whether the government improperly had encouraged Brown's invocation of the Fifth Amendment. I address such allegations of prosecutorial misconduct *infra,* section (A)(2)(a)(iii).

19. Notwithstanding the government's assertions to the contrary, the medical records raise a possibility that Brown suffered a second trauma after his arrest. *See, e.g.,* Defendants' Exhibit A at 6 & 10; Defendants' Exhibit D at 1–2.

20. Defendants claim that the alleged beatings should have been disclosed to Judge Haight. Because I find that there was no relevant im-

pact on Brown, the omission was not material, deliberate, or reckless.

21. On January 11, 1983 Brown was admitted to the Westchester County Medical Center. On that same day, Gardiner-Wells tongs were applied to help correct his neck injuries. Surgery was performed on his neck on January 19, 1983 to correct permanently his fracture.

22. The defendants apparently do not contest that Maxwell's affidavits established probable cause to believe that the enumerated crimes had been or were about to be committed, and that the wiretap subjects had or were about to commit them. This, perhaps, is because the affidavit, based on Brown's detailed and com-

▮ A probable cause determination requires an evaluation of whether the facts and circumstances established by the affidavits warrant a prudent man in believing that statements concerning the described offenses would be communicated over the relevant telephone lines. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). Maxwell's affidavit discusses at length the defendants' use of the telephones. Maxwell Affidavit at 18–26. Although he frequently does not state the subject matter of the defendants' telephone calls, he does note that "the telephones located [at BAAANA] are likely to be used for communications relating to the above-stated offenses." *Id.* 22, ¶ 7(j). Maxwell provides several items of circumstantial support for this statement. For example, a search of a "safe house" rented by one of the fugitive defendants in the parallel Rockland proceeding revealed a card for BAAANA with the 926–9494 telephone number. *Id.,* ¶ (j)(i). The pen registers and Brown's statements uncovered that Frankie Mae Adams had called 926–9494 over two hundred times in a five-month period apparently to arrange to speak to her husband LaBorde, then a fugitive. *Id.* 23, ¶ (j)(v). Finally, the pen registers revealed that numerous calls were made from BAAANA to the New Orleans, Louisiana residence of Bilal and Fulani Sunni-Ali. Bilal Sunni-Ali at the time was a fugitive. *See generally id.* 22–26.

▮ In summary, the affidavits showed that BAAANA was a central meeting place for several individuals alleged to be involved in the ongoing planning and commission of armed robberies. These individuals also apparently were in contact with others who were at that time sought-after fugitives. Telephonic communication between these subjects was alleged to be an integral part of their criminal activities. Therefore, I find that there was sufficient information to establish probable cause that the identified information would be intercepted by the wiretap.

prehensive information, extensively laid out the

## B. Second BAAANA Tap

Defendants assert that the government's application for an extension of the first BAAANA Tap violated 18 U.S.C. § 2518(1)(f); in addition, they again assert that there was no probable cause that particular conversations concerning the described offenses would be obtained by the wiretap. Finally, they reassert their allegations of unconstitutional misstatements surrounding Brown's reliability.

### (1) Section 2518(1)(f)

Section 2518(1)(f) provides that "where the application is for the extension of an order, [it must include] a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results." Contrary to defendants' assertions, Agent Maxwell's affidavit does set out the results of the initial thirty-day interception, and a reasonable explanation for their sparseness. As explained in more detail in the affidavit, the subjects frequently spoke over the phone in cryptic and guarded fashion, using what appeared to be a non-systematic code. *See* Maxwell Affidavit at 9–12, 15 (¶ g), 17, 23, 29 & 35. This provides a reasonable explanation for the paucity of results.

### (2) Probable Cause

▮ The use of cryptic or coded expressions is supportive of a probable cause finding. *See U.S. v. Sisca,* 503 F.2d 1337, 1343 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). Moreover, the intercepted communications also proved relevant to the probable cause determination. For example, on December 19, 1981, an intercepted communication referred to "Harriet," which Maxwell interpreted to be a reference to Joanne Chesimard, a federal fugitive wanted on charges of escaping from a state correctional institution. Maxwell Affidavit at 12. *See United States v. Fury,* 554 F.2d 522, 530–31 (2d Cir.), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1977) (reasonable interpreta-

evidence which established probable cause.

tion by agent of ambiguous conversations may support the probable cause determination); *see also Principie,* 531 F.2d at 1138–39.[23] On December 26, 1981, another conversation was intercepted that referred to Ms. Chesimard, which allegedly led to physical surveillance of Ms. Chesimard on Lexington Avenue and 29th Streets in New York City. *Id.* at 15–16, ¶ g. *See also id.* at 16–17, ¶ (i) (involving possible reference to Chesimard). On December 29, 1981, the government intercepted a conversation that appears to have involved the whereabouts of Anthony LaBorde, then wanted on charges of murdering a police officer in Queens, New York. *Id.* at 17–19, ¶ (j). These interceptions alone were enough to establish probable cause, warranting the extension orders granted in this case. Furthermore, the extension order added narcotics violations to the list of described offenses. The first thirty days had revealed several conversations, partially corroborated by physical surveillance, that also established probable cause that additional interceptions would provide evidence of narcotics violations. Accordingly, Judge Haight's extension of his initial electronic surveillance order for another thirty days was proper.

### (3) Material Misstatements and Omissions

Defendants seek to buttress their argument that the government misrepresented Brown's reliability with additional factual support. The first answer to their argument is that, as I have discussed above, Brown's information in support of the January 14 extension, was not necessary to find probable cause to continue the wiretap. The second answer is that there were no material misstatements or omissions.

Defendants cite the FBI agents knowledge that Brown had a "psychotic" episode on January 8, 1983. In addition, they note the January 13, 1983 medical record entry that states, *inter alia,* that Brown had to be restrained from removing his neckbrace and:

> [H]e had been hearing a voice over the jailspeakers saying "Fuck God" and that people were coming to harm him. [Brown] is convinced that these were real voices (particularly a friend, Gilbert, who was arrested with him). In fact the patient states that he's had this ability to pick up on conversations from miles away and that he first noticed it in 1980 .... He denies any suicidal thoughts now or any time in the past. He denies any hallucinations now or in the past of a visual nature .... Patient is mildly drowsy but oriented × 3 *with good remote and recent memory.* His affect is flat. *His speech is fluent and coherent without evidence of thought disorder.* He states that he is sad about events leading to his arrest. *He has zero current hallucinations or delusions. He has zero suicidal ideations. His ability to think abstractedly is good....* His judgment is fair .... His insight is minimal .... Thorazine 50 mg IM PRN for evidence of hallucinations or bizarre behavior.

Defendants' Exhibit D at 11–12 (emphasis added).

First, I note that Brown subsequently gave his statements a slightly different interpretation. He stated that he never said he heard voices from several miles away over the past two years, nor from the loudspeakers in the prison. Rather, he stated, he heard the guards' voices coming over their walkie-talkie radios. Defendants' Notice of Motion to Suppress Electronic Surveillance, Exhibit D at 86. The medical record also states somewhat ambiguously that it was Gilbert's voice in particular that he heard. Gilbert himself, in fact, stated that he frequently spoke to Brown.

Second, even though the agents credibly denied examining the medical rec-

---

**23.** Defendants' attack the factual basis of this interpretation and others in the affidavit. At this juncture, such assertions are no more than speculation. Obviously, if defendants obtain support for their assertions during trial, it can raise its objections in accordance with my discussion in section (A)(2)(a)(iii), *supra.*

ord, the record itself seems to detract from the defendants' argument. It states that Brown's remote memory was good and his speech clear. There was no evidence of thought disorders nor was it said that Brown was "totally unstable and hallucinating."[24] Brown did cut his arms and face, but the medical record also indicates that the cuts were superficial, did not require sutures, and that Brown himself did not perceive it as an attempt to kill himself. Furthermore, at no time does it appear that Brown's attorney(s) ever become sufficiently concerned to attempt to obtain any psychiatric care for Brown. This makes defendants' claims less credible. Brown's despondency is easy to comprehend. He was and is still potentially facing a substantial term in prison. The agent's failure to tell Judge Haight, however, that Brown was depressed is a far cry from omitting that fact that Brown had a serious mental illness. I find, therefore, that whatever omissions were made concerning Brown's mental health were not material.

Defendants also maintain that the January 14 wiretap application misrepresented Brown's truthfulness. Brown disclosed to the FBI agents after the December 15 wiretap application that he had both withheld information and lied. Furthermore, some of these falsehoods went beyond Brown's role in the robbery attempt, unlike his previously disclosed prevarications. Although the January 14 affidavit updated or revised the information it stated was provided by Brown, it did not state explicitly that Brown had lied. *See* Maxwell Affidavit at 33–35. The new information included: (i) that a meeting to plan another potential robbery involving various people had occurred prior to the October 20 Mount Vernon meeting; (ii) that Anita Hearns was a member of the Republic of New Africa ("RNA"), and that she had knowledge of the October 20 events; (iii) that Bayette

was affiliated with the RNA, and was a close associate of Mutulu Shakur; (iv) that BAAANA had an arsenal of weapons; and (v) that Yvonne Thomas was present at the Mount Vernon meeting on October 20. The significant aspect of this recitation is that these facts would have no impact on the probable cause determination. They add several participants that Brown apparently was shielding, but they do not change the probable cause determination. Brown's information still was backed up by substantial corroboration. Brown's earlier information was still reliable, if not entirely complete.

█ Thus, I am again faced with a situation in which the omitted information was not material. The affidavits would have been more accurate had they explicitly stated that Brown had been inconsistent, but I cannot say that their failure to include these facts was a deliberate or recklessly omitted material fact. Accordingly, I must dismiss this challenge to the grant of the January 14 extension application.

### C. Third BAAANA Tap

█ In the application for a second extension of Judge Haight's electronic surveillance order, the government adds information provided by Yvonne Thomas. The defendants note that the government did not disclose that Thomas was interviewed in a mental hospital, and that she had a history of mental health problems. The defendants are correct that such facts go to the reliability of the informant. *See Aguilar.* I need not explore the omission of these relevant facts in the government's application to Judge Haight in depth; excluding the information provided by Thomas still leaves sufficient information to establish probable cause. This information includes Brown's statements, and the deciphered conversations intercepted throughout the electronic surveillance. Therefore, the Third BAAANA Tap also was constitutionally permissible.

---

**24.** The quotation "totally unstable and hallucinating" comes from a statement made by Kenneth Gribetz, Rockland County District Attorney, during a habeas corpus proceeding before Judge Lasker of this District. *See* Affidavit of Jesse Berman, Exhibit D at 81. Gribetz ostensibly was referring to the medical record excerpt I have quoted above. As the medical record now discloses, Brown was not "totally unstable and hallucinating." Quite the contrary was in fact true.

### D. Fourth and Fifth BAAANA Taps

Defendants do not cite any deficiencies not already addressed above. Accordingly, I find these orders were constitutionally granted and executed.

### E. First and Second Barrow Street Taps and Bugs

Defendants attack the constitutionality of these surveillance orders on two grounds. First, they allege that the orders are the fruits of prior illegally obtained wiretap evidence. *See Wong Sun v. U.S.,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). I have held, however, that the previously intercepted communications were done so pursuant to constitutionally valid electronic surveillance orders. Therefore, this argument is no longer valid.

Second, the defendants argue that the affidavits in support of these orders failed to establish that alternative investigative efforts were inadequate.[25] *See* 18 U.S.C. § 2518(3)(c). In particular, defendants claim that Maxwell lied in his affidavit when he stated that because the government was unaware of informant Thomas' whereabouts, she could not introduce an undercover agent to the subjects of the wiretaps. They note that the initial application for the Barrow Street Tap and Bug was made on March 1, 1982. On February 27, 1982, however, agents overheard Thomas' phone call to BAAANA in which she stated that she was taking the 6:00 p.m. Greyhound Bus to New York City. Moreover, on March 1, 1982, agents intercepted a conversation in which Kamau Bayette, a wiretap subject, was told that Thomas was at BAAANA and that she would be kept there.

█ In neither of these situations cited by defendants, however, did the agents have actual knowledge or access to Thomas. Moreover, the government suspected that Thomas might have disclosed her "co-operation" with the government. Her usefulness as a go-between thus represented a substantial risk to the agents. In fact, in part

to secure her safety, she was arrested on March 6, 1982, on two old New York bench warrants. Except for the failure to use Thomas to introduce an undercover agent into the fold, the defendants present no other grounds for attacking the Barrow Street Taps and Bugs. Accordingly, I find that they are statutorily and constitutionally valid.

### CONCLUSION

In sum, I hold that the seven different electronic surveillance orders in the instant case are all valid and the motions to suppress the fruits thereof must be denied.